May it please the Court, I'm Robert Job and I'm appearing today on behalf of the petitioner Khalid Al-Mousa. In this case, the immigration judge ignored the petitioner's request for voluntary departure, used an incorrect legal standard in evaluating the petitioner's claim for relief under the Convention Against Torture, and then failed to grapple with the significant evidence in support of that application, and then rejected Mr. Al-Mousa's testimony as not credible on less than substantial evidence. First, I'd like to address the voluntary departure issue because it's undisputed that Mr. Al-Mousa requested voluntary departure. This is at page 57 of the administrative record. It's also undisputed that the immigration judge didn't address it. The government asserts that Mr. Al-Mousa waived his claim to voluntary departure because he didn't raise the issue before the Board of Immigration Appeals. It's important to note that before the Board of Immigration Appeals, Mr. Al-Mousa was proceeding pro se. He was detained. And it's, I think, clear from the record he speaks very limited English. This is on page 146 of the record. All he presented to the Board of Immigration Appeals is this brief notice of appeal that's set forth on page 23 of the record. But because he was going forward pro se, it seems to me that this notice of appeal does raise the voluntary departure issue with enough specificity because what it says is the immigration judge's decision to remove me from USA is not safe because I will be harmed, tortured, or killed if I am forced to return to Saudi Arabia. And by raising the issue about being forcibly returned and saying that it's the decision to remove me to Saudi Arabia that puts me in danger, we believe that that's sufficient to at least raise the issue of voluntary departure. With regard to the CAC claim, which we think is the strongest of our claims before the Court, it's important to note that even if this Court were to uphold the IJ's adverse credibility determination, we believe that the case has to be remanded for further consideration of the CAC claim. The strength of Mr. Almus's CAC claims in our view stems from, first, the widespread and well-documented use of torture by the Saudi authorities, including flogging for minor offenses. Even traffic offenses result in flogging. Second, that we the second factor that we consider to be very important with respect to the CAC claim is Mr. Almus's penchant for getting into trouble. And third, the undisputed fact that the Saudi authorities discriminate based on national origin. Now, does he have currently an outstanding judgment against him which requires 400? Yes. If you accept his testimony as credible, yes. But it's our view, you know, and I want to address the credibility determination, but it's our view even if you were to uphold that, given the strict standard of review, still the case has to go back on the CAC claim. And that's because this is set forth in the judge's decision, the last two pages here, 43 and 44 of the administrative record. Oh, he was given that judgment because of a supposed attack on an officer, is that right? Yes. Assaulting an officer. Yeah. And with the United States idea of what is torture. Right. Which was adopted by the immigration judge here. And that's part of the problem is that the immigration judge rejected the idea that flogging is torture. It's nothing better or worse than waterboarding. It's hard for me to say, Your Honor. I don't want to subject you to either one. But what's important here is the immigration judge, he didn't really dispute that flogging is widespread, and I don't think you can dispute that. Because I said the record makes clear that flogging is imposed even for traffic offenses. Instead, what he said is flogging isn't torture because although it leaves painful welts, there's no evidence that it causes death or permanent injury. Well, obviously that's not the test. Whether something rises to the level of torture, the issue is whether it inflicts severe mental or physical pain. Well, the issue becomes whether or not there's an individualized showing. And if the adverse credibility determination is upheld, what else is there in the record to show that this particular petitioner faces a possibility of torture? Well, it's our view that the immigration judge committed legal error because the regulations are crystal clear that, you know, all evidence has to be considered, all relevant evidence with regard to the cat claim. And a mere adverse credibility on the asylum claim, that doesn't necessarily doom the cat claim.  But under our jurisprudence, for instance, in Farrar, there's, you know, we say that if there's nothing, if there's an adverse credibility determination and there's no other individualized showing of the torture, then it doesn't survive. There's plenty of other evidence here. Individualized. And what I want to say is there's certain facts that are undisputed that would lead one to believe that there's definitely a possible cat claim here, and the judge didn't grapple with that. I mean, the first is the widespread use of flogging and other human rights abuses, and I want to come back to that. But the second, the most important thing probably that the judge didn't grapple with, is the fact that this guy has a real penchant for getting into trouble with the authorities. I mean, while he's been here in the United States, you know, the record is pretty sparse, frankly, but what we know here is that he was arrested and accused of assaulting his girlfriend. We know that he was arrested on another occasion for attempting to obtain a motorcycle by fraud. The police chased him to his home, the home of his girlfriend, actually, where what did he do? He drew a pistol, had a 45-minute standoff with the authorities, put the pistol to his head, threatened to shoot himself. Not exactly demonstrating the greatest sensibility. This is a person who we should keep in the country, you're saying? You may not have a choice, Your Honor, because cat relief is nondiscretionary. If a man can demonstrate a probability that he's going to be tortured upon return, yes. Individualized, though. The fact that he has displayed poor judgment does not equate to an individualized showing of torture. That's not my point precisely, because I'm not asking the court to rule on the merits of the cat claim. My point is simply that the immigration judge had an obligation under the regulations to consider all relevant evidence. He didn't consider that. He did the opposite. If you look at his decision, he actually said that Mr. Almus's authorities with law enforcement here in the United States are irrelevant. To the applications for asylum, withholding, and cat relief. And this is on page 32 of the admittance. What case authority do you have to support your argument that the fact that he had run-ins with authorities here support his cat claim? Well, it's a question of whether you regard that evidence to be relevant to the likelihood that he would be tortured. And I believe it's plainly relevant, because what the background documentation suggests is that in Saudi Arabia, anybody who gets into trouble, even minor offenses, even traffic offenses, is subject to corporal punishment, oftentimes in the form of caning or flogging. And the combination of those two things, yes, make me – make clear to me that he has established prima facie eligibility for cat relief. And the judge – Do you have a case that's anywhere close to that? Not on that particular point, because every case is different, Your Honor. The issue here is in the context of this case, a place like Saudi Arabia where anybody who violates the law is subject to, you know, oftentimes is at risk of corporal punishment, and this guy has a penchant for violating the law, yeah, that to me makes it relevant. The judge had an obligation to consider that – those factors. He didn't. He said the opposite. Not only did he not consider them, he said they're irrelevant. Let me take your argument to its logical conclusion. Any native of Saudi Arabia who's been in trouble here would then be prima facie eligible for a cat claim, because the penchant for getting in trouble here would translate to a penchant for getting in trouble in Saudi Arabia where they would be subject to flogging. That can't be right. I'm not suggesting that every Saudi national who has problems with the law is eligible for cat relief. All I'm suggesting, the argument that I'm making is that the judge had an obligation to consider that. The regulations are clear on that point. He didn't consider it. It's not for you to consider. It's for him to consider, and he did. It's for us to consider whether or not there's sufficient evidence in the record for us to remand it for the IJ or BIA to consider. Again, I disagree with that. The issue before you is whether the judge overlooked evidence that's relevant. If he did, it has to go back. It's not for you to determine whether or not the evidence establishes eligibility for cat relief. I didn't say that. I said the issue is whether or not there's enough here for us to determine that it has to be remanded. That is our call. Exactly. And that, the dispositive question on that point is did he consider the evidence, and secondly, is the evidence relevant? And we believe the evidence is relevant, and it's undisputed that he failed to consider it. Did I see any reference in your brief to this argument? I believe so, Your Honor, but it's oblique. I'll grant you that. And I'm going to reserve the balance of my time, but I'll look at the brief while I sit here and I'll try to find that for you. Thank you. May it please the Court. My name is Colette Winston. I represent Attorney General Mew Casey in this immigration case. There are four different parts to this case, asylum, withholding of removal, protection under the Convention Against Torture, CAT, and voluntary departure. Let me ask you just kind of a preliminary question. This individual is a minor. Is that correct? When he arrived in this country, he was 19 years old. Well, my record showed 18, but 18 or 19. In any event. Well, minors can be defined as 18 and under. Well, that's what my question to you is. There are some places where it seems to be 21. And what section do you turn to to show that it would be 18? There's one section, I think it's 8 CFR 242.16B. And there's actually a case that the Board issued called In Re Amaya, A-M-A-Y-A, at 21 I and N decision 583, specifically page 586, a 1996 Board decision. And that says, quote, in the case of an unaccompanied and unrepresented minor under the age of 16 years. So there they talk about 16. There's actually different other sections that talk about minor children. There's 8 USC 1101A-15F. Is there any regulation in the context of at what age you must apply for asylum? No. The statute is silent. The regulations are silent. There's no exception for someone who's under 21. 19, 20, 21, there's no exception. And what the opening brief does for the first time, not raised before the IJ, not raised before the BIA, is say that somehow there's an exception to the tolling of this statute, that somehow the one-year bar should be tolled until individuals reach the age of 21. Well, that's creative, but there's no grounds for that. Most importantly, that issue was not exhausted before the Board. By any way that one can stretch the notice of appeal that was filed by Mr. Almusa, it cannot stretch as far as to say that it was exhausted before the Board. The Board has not reviewed it. In any event, this Court has no jurisdiction to review asylum applications and equally has no jurisdiction. Well, we do if we can review legal points. And if he had until a year after he was 21, that's really a legal determination, nothing to do with factual.  If it was raised. Under the Real ID Act. If it was raised. Yes. If it was raised. Under the Real ID Act, you are entitled to review questions of law. Right. And constitutional questions. There's no doubt about it. Had it been raised before the Board and had it been exhausted, then this Court would have had jurisdiction to review it. But. And the Board would have had a chance to weigh in on this. Exactly. So first, there's no jurisdiction. Even if this is a legal issue, it wasn't exhausted. In any event, this Petitioner was not credible, so it would be an exercise in futility to remand this case to the Board for it to rule in the first instance. And if none of the above were true, then remand would be appropriate. But we would submit that there's no reason for remand, it wasn't exhausted. And so, therefore, Mr. El Moussa did not have a claim for asylum. He just didn't exhaust that argument that he's now making for the first time before this Court. What about the voluntary departure issue? Was that raised? The voluntary departure issue was not raised either. It was not raised before the Board. I can read you exactly what was raised before the Board. He did not file a brief. He only filed a notice of appeal, and he had one paragraph. And the paragraph can be found, well, I don't have it, I don't have it offhand, but I can read it to you as, I was targeted and forced to leave Saudi Arabia. I'm fearing harm based on race, nationality, torture convention. My charge with assault and battery will take place. And I'm ordered to be whipped 400 times. I knew I could not escape to be tortured or killed. The judge's decision to remove me from the USA is not safe because I will be harmed, tortured or killed if I'm forced to return to Saudi Arabia. The judge did not believe anything I said. That was the entire notice of appeal. Is there any obligation on the part of the I.J. to advise the individual that he might be entitled to a voluntary departure? I don't know the answer to that, Your Honor. I don't either. I would be glad to submit a supplemental brief. Well, if we want it, we'll ask for it. Okay. But even if you take the notice of appeal and stretch it to its logical, reasonable limits, it does not cover voluntary departure. So that, too, was not raised before the board. So there's no reason for this Court to review it because it was not exhausted. Mr. Al Musa did have a chance to establish withholding of removal. And he did not establish it. And the immigration judge found five material inconsistencies that went to the heart of his claim where he alleged one thing in his declaration. He wrote a second declaration, alleged other things, and then he got to his hearing and he had yet another story, the most important of which was he stated, I began to speak out about my father's death and how his race led to his killing, and I was targeted as a result. Now I'm paraphrasing. But that's in his first declaration, page 196. In his second declaration, he said, I only spoke out about my father's death one time, and I was not targeted as a result. So it's directly contradictory. That was in his second declaration, page 182, and in his hearing, pages 109 to 110. But his explanation is that his language was poor and that he wanted to make these corrections so that the record would be correct as to exactly what happened. That sounds like perhaps real credibility. Well, he explained that it wasn't properly translated. He had a translator there. It was a different dialect of Arabic, and he hadn't had a chance to read the application, although he signed it under penalty of perjury. So, you know, his explanation, he was given an opportunity to explain at the hearing, and the immigration judge did not buy his explanation, did not believe that that explanation credibly explained the discrepancy. He had other discrepancies as well with regard to the recognition of an officer. He said he recognized the officer because he had prior dealings with him. Later he said he only recognized him by reading his name on the name tag. He also stated he was arrested at home. Later he said he was arrested at his grandmother's house. And when he was given an opportunity to explain, there wasn't any true explanation. The immigration judge did not believe his explanation, that his father somehow owned two houses. The record is full of references to grandmother's house and then other references to his home. They were different places. There were other discrepancies as well with regard to payment of a bond or paying an officer, a broken nose that just came up at the hearing but hadn't come up before. This is more than just a language problem. This is more than just a translation problem. He – the immigration judge felt he was trying to embellish his claim and exaggerate his claim initially when he made his asylum application. And then when he got a second attorney, backed down and signed a different declaration and changed the story at his hearing. Counsel, could you address the CAC claim? Yes. With regard to the CAC claim, at base the immigration judge stated he was not credible. But the immigration judge went on to say even if he were credible, the immigration judge found that the way the lashes are administered in Saudi Arabia where there's a Bible that's supposed to be held under the individual's arm who's giving the lashes and it has to be done with a certain instrument, that that would leave painful welts but wouldn't cause permanent injury or death. And when my opposing counsel stood up here and said that even minor traffic violations result in flogging and severe punishments, even if that were true, what we would end up having to do is allow everyone to come in from Saudi Arabia, because you never know if a person's going to jaywalk or run a red light or fail to stop at a stop sign. So the immigration judge ruled based on credibility. That was his point. Do you think 400 lashes would be torture? Would I think that? I wouldn't even want one lash. But whether it would rise to torture would really be up to the fact finder. And certainly I do not think that it's the job of an immigration judge to really pass judgment on the legitimacy of a sentence involving assault and battery of a police officer. But it's not so much that it's certainly harsh. Sure it is. If the judgment was that he would be put on the rack and tortured for 24 hours, of course it's he's administering the Convention against Torture. True. And it's certainly harsh. And it's certainly harsh by U.S. standards. There's no question about it. But at bottom, he was found to not be credible. And that lack of credibility sends a shadow really over his whole testimony. Is there any challenge to the fact that he's been convicted and that he was subject to this judgment? There's no doubt that that's accurate. Maybe everything else he said was inaccurate. I think when someone has so many inconsistencies where there's a pattern of inconsistencies throughout one declaration, second declaration, and a hearing, it really does cast a shadow over all his testimony. Was there any judgment of conviction or anything introduced into the record that showed the punishment, that he was subject to this flogging if and when he returned, anything like that? Nothing at all. No independent objective evidence that this was even true. It was just his word. And there was no word against him. But it was just his word at the hearing as to what happened and his punishment. There was evidence, I believe, in one of the country reports that a lot of the process is not public when somebody is convicted. Is that correct? That's my recollection, yes, Your Honor. But whether public or not. You may not have been able to get a judgment to introduce. It's a little hard to believe that someone would confess to having a judgment against them for assaulting a police officer if it weren't true. Yet he got a passport and he got a visa to come to the United States. So, of course, that's in the record, but it wasn't something that the IJ or BIA dealt with. He was able to get a visa. If he had a sentence against him, I would reasonably assume that it would have been harder for him to get a visa to come to this country. If there are no further questions. Thank you. Thank you. Rebuttal. Just very briefly. With regard to the credibility stuff, there are five reasons set forth by the immigration judge. The second, third, and fifth reasons, he never gave Mr. Musa any opportunity to even explain. So under Ninth Circuit law, those aren't supposed to even be taken into account. The first issue, you know, this paragraph 11, this is what, it's kind of crazy because he corrected this before he began his testimony. His lawyer presented a declaration. He testified that he'd never seen it before it was presented. His English was limited. You know, they were speaking in a different dialect of Arabic, Lebanese versus Saudi, and he said it was wrong. But he corrected it before he even was sworn to testify in court. And actually, what's odd about this case, he was never sworn to the application at all, which is very unusual in these proceedings. Normally you are. But he corrected it before he began his testimony. That's not the kind of thing that should be used to undermine an applicant's credibility. The only other one that he had an opportunity to explain is the issue about the 10,000 riyal payment. You know, he said at one point that it was bond, and then he said later it was given to the police officer. But this is set forth at page 128 of the record. And I want to quote that if I can. Because this is the only other adverse credibility factor. The question from the trial attorney is, because he'd been referring to the $10,000 payment as a bond, but he also said he had no role in paying it. A friend of the family paid this money. And the question is, and you were released from prison, this is on 128, because you paid money indicating that you called it a bond. What was that money to insure? And he answers, this is to pay for the officer that was involved, to pay him his restitution. And he goes on to say basically this was to pay off the officer. I mean, you know, the word he used was, at least the way it was translated, was bond. But when he was asked what was it for, he was perfectly consistent about what the money was being paid for. And he says over here on page 130, the money was just to give him some kind of money to make him happy so he wouldn't say anything to the judge. It was an attempt to pay him off. And, I mean, that's being about as blunt as an applicant for asylum is in these proceedings. Thank you very much. Counsel, did you find? Go ahead. I'm sorry. The footnote, there are a couple things that I would want to point to. First, the footnote 13, where we say even if you deem him not credible, basically you still have an obligation to examine the merits of the CAT claim. And then most of the brief here on the CAT claim is about the extent of flogging and the likelihood that he's going to be flogged. If there are no further questions. All right. Thank you. Thank you. Do you have any other questions? Judge Canby on that. Thank you to both counsel. The case is submitted for decision by the court. The next case on calendar for argument is Vahid v. McKacy.
judges: Fletcher, Canby, Rawlinson